Filed 1/28/21  In re Cameron T. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re CAMERON T., a Person Coming Under the Juvenile Court Law. | B304286 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID T.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP05079A) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen Marpet, Juvenile Court Referee. Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

David T., the father of two-year-old Cameron T., appeals from the juvenile court's December 6, 2019 order pursuant to Welfare and Institutions Code section 366.26[1] terminating his parental rights and identifying adoption as the permanent plan for Cameron. Father contends the juvenile court committed prejudicial error in proceeding with the section 366.26 hearing in his absence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Dependency Petition and Detention*

#### 1. *July 2018 Incident*

The Los Angeles County Department of Children and Family Services (Department) received a referral on July 22, 2018 alleging Kylee L.'s (Mother) and Father's general neglect of then almost one-month-old Cameron. After leaving Cameron with Britny, the maternal aunt, on July 19, 2018, Mother and Father "partied" for multiple nights. Mother stated she got "too drunk" and "used methamphetamine and cocaine" to prevent alcohol-induced vomiting. Father also "got really drunk" and smoked methamphetamine.

On July 22, 2018, when Britny attempted to return Cameron to Mother and Father, Britny found Mother and Father asleep in a car. Britny stated that "when she tried to wake up [Mother,] it looked like she was under the influence of some type of drug" because Mother was "groggy and slurring her words in the beginning." After Britny called the police, Mother told a police officer that she and Father were not under the influence of

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

drugs. The police told Britny to take Cameron home with her pending the Department's investigation. Britny called the police because "she want[ed] it documented so when she takes [Cameron] back with her, [Mother and Father] cannot pin kidnapping charges on her."

### 2. *The Department's Investigation*

The Department made an unannounced visit on July 23, 2018 to Mother and Father's home that they shared with Cameron's paternal uncle and grandmother. Although Mother denied past substance and alcohol abuse, Mother admitted that she drank alcohol occasionally and that she had used marijuana and other drugs, including methamphetamine. Mother "stated that she doesn't regularly smoke meth anymore and the last time she smoked before Saturday was 2 years ago." Mother reported that Father had been addicted to methamphetamine, but had "stopped as well" following Cameron's birth. Mother stated that she and Father were willing to drug test for the Department. However, "Mother stated that she knows that her first test will come out dirty but she doesn't care [because] she knows that she's not addicted to meth."

Father admitted that he had used methamphetamine about four times a week over a 10-year period. Father stated he had stopped using methamphetamine when Cameron was born and that, prior to July 21, he had not used methamphetamine in about a month. Father stated that Mother previously had used methamphetamine as well, but that she had quit two years ago. Father admitted that he had a "few possession of narcotics charges in the past," with some of the charges still pending. Father also stated there were "gun charges" pending against him.

The Department made an unannounced visit to Britny's residence on July 24, 2018. Britny lived with her husband Ryan and her eight-year-old son. Cameron appeared healthy, well-groomed, appropriately dressed, and free from visible signs of abuse or neglect. The Department observed that Cameron was comfortable in Britny's arms during a feeding. Britny was concerned about Cameron's well-being in light of Mother's and Father's history of substance abuse. Britny stated she was able and willing to care for Cameron. On July 24, 2018, Mother and Father tested positive for amphetamine, methamphetamine, and cocaine. On July 31, 2018, Mother and Father tested positive for methamphetamine, and Mother also tested positive for amphetamine. On August 8, 2018, Father "stated that he was under the influence and had used meth that day."

On August 8, 2018, the juvenile court issued an order to remove Cameron from his parents' custody. The Department detained Cameron from Mother and Father and placed him with Britny.

### 3. *Dependency Petition*

The Department filed a dependency petition on August 10, 2018, alleging two counts pursuant to section 300, subdivision (b)(1). In count b-1, the Department alleged that Mother "has a history of substance abuse, including marijuana, and is a current user of amphetamines, methamphetamines, and cocaine, which renders [Mother] unable to provide regular care and supervision of [Cameron]." In count b-2, the Department alleged that Father "has a ten-year history of substance abuse and is a current user of amphetamines, methamphetamines, and cocaine, which renders [F]ather unable to provide regular care and supervision of [Cameron]." The Department further alleged that Mother's

4

and Father's "substance abuse . . . endangers [Cameron's] physical health and safety and places [Cameron] at risk of serious physical harm and damage."

### 4. *Detention Hearing*

At the August 13, 2018 detention hearing, after finding a prima facie case for detaining Cameron and finding that he was a person described by section 300, the juvenile court detained Cameron from Mother and Father and placed him with Britny under the Department's supervision. The juvenile court ordered weekly random drug and alcohol testing, a six-month drug program, and individual counseling for Mother and Father. The juvenile court also ordered monitored visitation for Mother and Father. Mother and Father did not attend the hearing. The juvenile court scheduled the jurisdiction hearing for September 13, 2018 and the disposition hearing for October 12, 2018.

### B. *Jurisdiction and Disposition Hearings*

#### 1. *The Department's Jurisdiction and Disposition Report*

Britny told the Department that Mother and Father "were dropping Cameron off to her every weekend since he was born to care for him while they went to party on the weekends." Britny stated Mother had a five-year "methamphetamine problem." According to Britny, Mother admitted that she was having a "hard time getting off from using methamphetamine." After Cameron was detained, Father admitted to Britny that he "has a 10-year problem with methamphetamine." Britny stated that Father "had offered to sell her blue pills, which were ecstasy," and Mother had told her that Father sold methamphetamine and cocaine. Britny expressed interest in adopting Cameron if

5

Mother and Father failed to reunify with him.

Mother admitted that, after using methamphetamine on July 21, 2018, she used the drug again the following week "due to the stress she was experiencing from the detention of Cameron." Mother stated that she had not used since then and that she was "learning to cope in other ways." When asked about her substance abuse history, Mother stated that "methamphetamine was always around" and that "she was an occasional user and not every day." Mother stated that "her drug of choice was marijuana" and that "she used to drink alcohol a lot also." Mother stated she completely stopped drinking alcohol and smoking marijuana when she was pregnant with Cameron. Although Mother admitted she had an "addictive personality," she stated: "I don't feel like there's a substance abuse issue. This case shouldn't be open." Mother stated that "she does not understand why [Britny] would do this to her."

Father stated that he had "'done everything' in regards to drugs" and that he sold drugs to supply his own habit until he was incarcerated for drug use. Father claimed that, before using methamphetamine on July 21, 2018, he had been clean for about two and a half to three years "with 'sometimes a bump of coke.'" Father stated that "a bump of coke '[was] nothing' compared to [his use] during his prime" "using drugs period." Father stated "he does not seek out drugs and 'if it's there it's there.'" Father "stated that he did not understand why he 'got the short end of the stick' and [Cameron] was taken away."

Although Mother and Father stated they planned to do everything necessary to reunify with Cameron, Mother and Father did not appear for their scheduled drug testing appointments on August 20, 2018. Britny reported that Father

6

was falling asleep on the couch during his monitored visit with Cameron on September 6, 2018. The Department advised Mother and Father that, because of Cameron's young age, "they would more than likely only be granted 6 months to reunify with [Cameron], and should they fail to reunify with [Cameron], the Court could seek a permanent living arrangement for [Cameron] through adoption or legal guardianship."

### 2. *September and October 2018 Hearings*

At the September 13, 2018 hearing, the juvenile court in a "'heart to heart' conversation" with Mother and Father advised them that they needed to comply with the court's orders, including participation in a "substance abuse program" and submission to "weekly random drug testing." The juvenile court also ordered the Department to investigate an in-patient drug treatment program for Mother. The juvenile court further ordered Mother and Father to call Britny to confirm their monitored visits 24 hours in advance. The juvenile court admonished Mother and Father that, if they failed to visit Cameron, the court "will cease [their] visits with [Cameron] pending the next court hearing." The juvenile court continued the jurisdiction hearing to October 12, 2018.

In an October 10, 2018 last minute information for the court, the Department reported that Mother had failed to show for a scheduled drug test on September 18 and that Father had failed to show for a scheduled drug test on October 1. The Department noted that, after Father had been arrested in Orange County on October 2, he was released from jail on October 5. Britny reported Father had not been visiting Cameron and Mother's visits with Cameron had been "sporadic."

7

At the October 12, 2018 jurisdiction and disposition hearing, the juvenile court sustained both counts of the petition under section 300, subdivision (b), declared Cameron a dependent of the juvenile court, and placed Cameron with Britny under the Department's supervision. The juvenile court ordered Mother and Father to participate in and complete a drug and alcohol program with aftercare, parenting classes, individual counseling, and a 12-step alcohol and narcotics program with a sponsor and court card. The juvenile court also ordered Mother and Father to submit to random on-demand weekly drug testing. The juvenile court admonished Mother and Father "that due to the age of [Cameron] being under 3 they have 6 months to show the court substantial progress in their programs including testing clean in order to receive further reunification services. If no progress is made by then[,] the court will likely terminate their family reunification services and set a permanent planning hearing for [Cameron] which could be adoption." The juvenile court scheduled a six-month review hearing (§ 366.21, subd. (e)) for April 12, 2019.

C.  *October 2018 - March 2019*

1.  *The Department's Report*

The Department reported that Father provided a "progress letter" showing his enrollment in a six-month outpatient substance abuse program on November 26, 2018. The letter stated that Father had attended four individual and six group sessions. While Father submitted to three drug tests through this substance abuse program in 2018, Father failed to appear for all nine scheduled drug tests with the Department's designated testing agency. The social worker reminded Father that he needed to call the Department's approved agency each

8

day and test with that agency.  Father stated that "he had not had time to enroll" in parenting or other programs because he was a "busy man."  Father stated "that he has a lot of things to worry about and things to take care of before he can worry about the classes."  Although Father told the Department he was attending a 12-step program, Father did not provide the Department with his participation sign-in card or his sponsor's contact information.

During a November 2, 2018 meeting with the Department, Mother stated she and Father had not attended parenting classes or individual counseling "'because they [were] very busy trying to get their things in order.'"  Mother stated she was "'trying to go back to school'" and enroll in college.  As of January 15, 2019, Mother had not provided the Department with proof of enrollment in a substance abuse program, parenting classes, or individual counseling.  While Mother had been previously enrolled in a substance abuse program, Mother was discharged for failure to attend on a regular basis.  The counselor stated that Mother "was not committed to the program and did not appear willing to participate in the program."  Mother failed to submit to the 11 drug tests scheduled between August 2018 and January 2019, stating that "she forgets" that she was required to call the agency.  Although Mother agreed to meet with the Department on December 21, 2018 and January 11, 2019, she failed to attend the meetings.

Mother's and Father's monitored visits with Cameron continued to be "inconsistent."  Britny reported that Mother and Father did not appear interested in visiting with Cameron. Britny cancelled a visit on October 24, 2018 when Mother and Father "showed up to the visit and appeared to be under the

9

influence." Father stated that he and Mother could not regularly attend their scheduled visits with Cameron because their car was "'always breaking down.'" However, Father also reported driving "'all over the place' (Orange County, San Fernando Valley, Los Angeles County) to complete his jobs and to visit friends." The Department reported that Mother and Father had not taken advantage of the Department's offer of transportation assistance.

The Department reported that Britney and Ryan were "very interested" in adopting Cameron and providing him "with a safe, stable and loving environment in the event the parents fail to reunify" with Cameron. The Department reported that Britny's family was relocating to North Carolina due to Ryan's military transfer and that they wanted Cameron to relocate with them. Britny offered to stay in California with Cameron until the juvenile court authorized Cameron's travel to join the family in North Carolina. The Department concluded that Mother and Father "ha[d] shown minimal efforts in trying to reunify with . . . Cameron." The Department recommended that the juvenile court terminate reunification services for Mother and Father.

2. *Cameron's Extended Visit to North Carolina*

On January 23, 2019, Cameron's counsel filed a "walk on request" asking the juvenile court to permit Cameron to travel with Britny to North Carolina for an extended visit. The Department recommended that the juvenile court allow Cameron to travel to North Carolina with Britny's family on the extended visit in order to "maintain family ties and stability." Britny and Ryan expressed their willingness to travel from North Carolina to California with Cameron to facilitate monitored visits with Mother and Father.

10

At a January 25, 2019 hearing, Cameron's counsel argued: "The caretaker also kept an extensive log which adds one more updated visit. There were 32 no shows or canceled visits by the Mother and 33 by the Father during this period just so the record is complete. . . . She will return and make the child available." Although Mother and Father objected, the juvenile court granted the request for Cameron's extended visit to North Carolina with Britny's family. The juvenile court conditioned its order upon Britny making Cameron available for "visits for the parents by traveling to Los Angeles in a reasonable fashion."

The juvenile court found: "If either one of these parents did anything to show the court they wanted [Cameron] back in their life[,] I certainly would have had a different take on everything but neither one of these parents have done anything. They haven't tested. They haven't enrolled in programs. They have [not] done anything. This is a child under the age of three. They have less than three months to show the court that I should even give them any more time. So, frankly, they have no sympathy from me. . . . They have shown nothing to show me that they really want to reunite with [Cameron], and . . . [Britny and Ryan] are willing to bring [Cameron] back, allow a lot of these visits to be made up while [Cameron] is here. And I see no reason [not] to order an [Interstate Compact on the Placement of Children (ICPC)] and allow the extended visit. So, over your objection, the court is going to grant it. . . . And the extended visit will go through the 25th of February. As I understand it, they're bringing [Cameron] back for the fetal alcohol syndrome appointment that's already set." The juvenile court ordered the Department to initiate an ICPC home assessment for Britny and Ryan in North Carolina. The juvenile court also set a review

11

hearing for February 25, 2019.

### 3. *Father's Application for Rehearing*

On February 4, 2019, Father filed an application for rehearing of the juvenile court's January 25, 2019 order allowing Cameron's extended visit in North Carolina. Father argued he was "making progress in his court ordered case plan, and [was] visiting with [Cameron], with the strong intent of reunification with [Cameron]." Father further argued that Cameron's extended stay in North Carolina "impeded [his] reunification." After granting Father's request for a rehearing, on March 4, 2019, the juvenile court ordered Cameron to remain with Britny and extended Cameron's North Carolina visit for 29 days. The juvenile court ordered the Department "to exercise reasonable efforts to facilitate visits" with Mother and Father. Father did not attend the hearing. The juvenile court scheduled a review hearing for March 25, 2019. Father did not appeal from the January 25 or the March 4, 2019 order.

### 4. *February and March 2019 Progress Hearings*

The Department reported that Father had been arrested in Orange County on February 15, 2019 because Father "was allegedly trying to steal from the Post Office." Father had not provided the Department with any information regarding parenting classes, individual therapy, or a 12-step program. Father also had not tested with the Department's approved agency. Father provided an updated progress letter from his substance abuse center outpatient program. The letter stated that Father had attended five additional individual sessions and eight additional group sessions. Mother had failed to enroll in any court-ordered programs and had not submitted to any drug

12

testing.

Britny reported Mother and Father had only contacted her once since Britny's family and Cameron arrived in North Carolina. Father had "asked how the trip had gone, but did not bother to ask about Cameron." Father attended two of eight scheduled visits with Cameron between February 1 and March 6, 2019 and arrived late to both visits. Mother arrived late for all five visits she attended.

At hearings on February 25 and March 25, 2019, the juvenile court extended Cameron's visit in North Carolina.

### D.    *Six-Month Review Hearing*

#### 1.    *The Department's Reports*

The Department reported that Britny and Ryan were committed to adopting Cameron if he did not reunify with Mother or Father. Cameron was a "happy baby" and was reaching his developmental milestones. Although Mother and Father each stated that they wished to reunify with Cameron, the Department reported that there was a high risk of future abuse and neglect if Cameron was returned to Mother and Father. Despite monthly reminders, Father had failed to submit to a single drug test with the Department's approved agency. Father had completed only two months of a six-month substance abuse program (in part due to his incarceration), had not completed an aftercare program, had not provided proof of enrollment or attendance for a 12-step program or proof of a sponsor in such a program, and had not provided proof of enrollment or any progress letter for a parenting program or individual counseling. When the Department asked Father why he had not complied, Father stated: "[H]e ha[d] not 'gotten to it' because he [was] busy with taking care of his disabled mother, working his odd jobs and

meeting with his probation officer." Mother had failed to show proof of compliance with any aspect of her case plan.

Although Britny and Cameron continued to travel from North Carolina to Los Angeles for Mother's and Father's monitored visitation, Mother and Father continued to have "inconsistent visits" with Cameron, including cancelled visits and late arrivals. Mother and Father had missed 38 scheduled visits with Cameron since August 2018. The Department concluded that Mother and Father had "shown little to no effort in complying with the Court ordered programs." The Department recommended that the juvenile court terminate reunification services for Mother and Father and schedule a section 366.26 selection and implementation hearing for Cameron. In an April 12, 2019 last minute information for the court, the Department reported that Mother and Father provided the Department with letters on April 9, stating that Mother and Father had enrolled in a parenting program on March 28 and completed two of the program's 10 units.

### 2. *April 2019 Hearings*

At the April 12, 2019 six-month review hearing (§ 366.21, subd. (e)), the juvenile court observed that the parents were "not in compliance with the case plan" and that "there [was] no likelihood they will be able to reunite" with Cameron. Father's counsel requested that the juvenile court set the matter for a contested hearing. Although Father "failed to provide a single test result and he's missed every single [agency] test," the juvenile court scheduled a contested hearing.

At the April 19 contested hearing, Father's counsel argued, although Father had not drug tested with the Department's approved agency or begun individual counseling, Father had been

14

consistently enrolled in a substance abuse program and had been testing for the program; he had a sponsor; and he had enrolled in and completed four of a parenting program's 12 classes. Father's counsel also argued that Father had visited Cameron the previous week while Cameron was in Southern California. Mother's counsel joined with Father's counsel in asking the juvenile court to order continued reunification services for the parents, arguing that Mother had enrolled in drug and parenting programs and that she visited with Cameron when he was in Southern California. The juvenile court ruled that "both parents [were] in meager compliance with the case plan. There [was] no likelihood that they would reunite" with Cameron. The juvenile court therefore terminated reunification services and set a selection and implementation hearing for August 16, 2019. The juvenile court ordered another 30-day extended visit for Cameron with Britny and Ryan in North Carolina. The juvenile court did not order continued monitored visits for Mother and Father because "the goal is now a permanent plan for [Cameron]." At nonappearance progress hearings on May 21, June 18, and July 18, 2019, the juvenile court issued orders extending Cameron's North Carolina visit.

    E.   *Selection and Implementation Hearing*

        1.   *The Department's Status Reports*

The Department reported that, although Britny had encouraged Mother and Father to call or video chat with Cameron, Mother and Father did not attempt to communicate with Cameron. The Department also reported that a North Carolina social worker visited Britny's home in June and observed it to be a safe and positive environment for Cameron. Cameron was "developmentally on track," "healthy," and

15

"comfortable" with Britny and Ryan. The Department reported that Cameron "appears to be thriving" with Britny's family. Britny reported that, after not receiving any calls or texts from Mother or Father for several months, Father sent Cameron a birthday card, stating: "'Daddy is very sick, but I'm going to get better and come get you.'"

### 2. *August and October 2019 Hearings*

At the section 366.26 hearing on August 16, 2019, the juvenile court continued the hearing to October 11 and ordered the Department to provide further information regarding Cameron's adoption assessment and the North Carolina ICPC investigation. Because Father was incarcerated in Orange County, the juvenile court ordered the Department to submit an in-and-out order for Father to be transported to the continued section 366.26 hearing.

On October 11, 2019, the juvenile court continued the section 366.26 hearing to December 6, 2019 because Father had not been transported to court. The juvenile court ordered the Department to submit an in-and-out order for Father to be transported to the December 6 hearing. The juvenile court also ordered the Department to give Father notice of the December 6 hearing. On November 6, 2019, the juvenile court issued the in-and-out order requiring Father to be transported to the section 366.26 hearing on December 6. The Department transmitted the order to the Orange County jail in which Father was incarcerated. The Department also gave Father notice of the section 366.26 hearing.

16

### 3. *December 6, 2019 Hearing*

A statewide tracking sheet dated December 5 indicated that Father "ha[d] current Orange County court dates pending [and was] unavailable to L.A. County at this time." Because Father was not present at the December 6, 2019 hearing, Father's counsel requested a continuance. In rejecting Father's request for a continuance, the juvenile court ruled: "I made attempts to bring him in. We have good notice to Father in Orange County but they won't let him go. So, unfortunately, we've given proper notice and we're going forward. . . . The report reflects that we have good notice to both Mother and Father." After Father's counsel "objected to the termination of parental rights," the juvenile court found by clear and convincing evidence "that it would be detrimental to [Cameron] to be returned" to Mother and Father and that Cameron was adoptable. The juvenile court terminated Mother's and Father's parental rights and transferred Cameron's care, custody, and control to the Department for adoptive planning and placement. The juvenile court designated Britny and Ryan as the prospective adoptive parents.

By notice dated February 3, 2020, Father appealed from the juvenile court's December 6, 2019 order terminating his parental rights.

## DISCUSSION

The juvenile court erred when it terminated Father's parental rights at the December 6, 2019 hearing without Father being transported to court as required by Penal Code section 2625, subdivision (d). The Department, however, argues "any error in proceeding in [Father's] absence was harmless." The Department further argues that "[c]ounsel for Father was given

17

the opportunity to be heard . . . but never raised the parental benefit exception" and that "there was ample evidence that Father had not maintained consistent visitation, contact, or even interest in [Cameron]." Father contends the juvenile court's error was prejudicial because, "[h]ad David been allowed to be present for the section 366.26 hearing [,] he could have provided information to the court about the quality of his relationship with Cameron and made the argument that he had more contact with [Britny] than she was indicting [*sic*] to the social worker." However, even if Father did not forfeit the argument that the beneficial parental relationship exception applied because his counsel failed to raise it at the section 366.26 hearing, it was not reasonably probable that there would have been a more favorable outcome had Father been present at the hearing.

A. *The Juvenile Court's Error in Terminating Father's Parental Rights in His Absence Was Harmless*

1. *Applicable Law and Standard of Review*

a. *Penal Code section 2625*

In enacting Penal Code section 2625, the Legislature has devised a scheme by which state prisoners may physically appear at the section 366.26 hearing if they wish. (*In re Gray U.* (1982) 136 Cal.App.3d 494, 498.) Penal Code section 2625, subdivision (d), prohibits terminating parental rights under section 366.26 without the physical presence of an incarcerated parent unless the parent has knowingly waived his or her right to appear: "Upon receipt by the court of a statement from the prisoner or his or her attorney indicating the prisoner's desire to be present during the court's proceedings, the court shall issue an order for the temporary removal of the prisoner from the institution, and for the prisoner's production before the court. No proceeding

18

under . . . Section 366.26 of the Welfare and Institutions Code . . . may be adjudicated without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit signed by the warden, superintendent, or other person in charge of the institution, or his or her designated representative stating that the prisoner has, by express statement or action, indicated an intent not to appear at the proceeding."

The Supreme Court in *In re Jesusa V.* (2004) 32 Cal.4th 588 confirmed that the reference in the statute to the "physical presence of '"the prisoner *or* the prisoner's attorney"'" did not mean only the presence of the incarcerated parent's lawyer was required. (*Id.* at p. 622.) Analyzing the legislative history of the provision, the Supreme Court held the word "or" in this phrase is properly given a "conjunctive meaning": "These materials reveal a strong legislative interest in enabling the prisoner to attend the hearing, an interest that would be undermined by interpreting the statute to make the attorney's presence sufficient in every case." (*Id.* at p. 623.)

The *Jesusa V.* Court held violation of Penal Code section 2625, subdivision (d), was not jurisdictional and, therefore, not reversible per se. The Court explained, "[W]e have regularly applied a harmless-error analysis when a defendant has been involuntarily absent from a criminal trial. [Citations.] We do not believe the Legislature intended a different result in the analogous circumstance here, when a prisoner is involuntarily absent from a dependency proceeding." (*Jesusa V., supra,* 32 Cal.4th at p. 625.) The Court concluded the familiar *Watson* harmless error standard should be applied—that is, reversal is

19

not required unless it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.  (*Ibid.*; accord, *In re M.M.* (2015) 236 Cal.App.4th 955, 963-964; see generally *In re Celine R.* (2003) 31 Cal.4th 45, 59-60 [harmless error doctrine applies in dependency cases; dependency court order should not be set aside unless it is reasonably probable the result would have been more favorable to the appealing party but for the error].)

       b. *Beneficial parental relationship exception*
         *to termination of parental rights*

  "The section 366.26 hearing is a critical late stage in a dependency proceeding.  The child has been under juvenile court jurisdiction for an extended period following the dispositional order, and the court has held one or more review hearings to consider a return to parental custody.  [Citation.]  At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child.  [Citation.] . . . If adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child."  (*In re S.B.* (2009) 46 Cal.4th 529, 532; see *In re Celine R., supra,* 31 Cal.4th at p. 53 ["[I]f the child is adoptable . . . adoption is the norm.  Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"]; *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1299 ["'[w]henever the court finds "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption"'"].)

Section 366.26 requires the juvenile court to conduct a two-part inquiry at the selection and implementation hearing. First, the court determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re D.M.* (2012) 205 Cal.App.4th 283, 290.) Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute provides "the court shall terminate parental rights" unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B); see *Cynthia D.*, at pp. 250, 259 [when the child is adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is "'relatively automatic'"].) "One exception to adoption is the beneficial parental relationship exception. This exception is set forth in section 366.26, subdivision (c)(1)(B)(i) which states: '[T]he court shall terminate parental rights unless either of the following applies: [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'" (*In re Noah G., supra*, 247 Cal.App.4th at p. 1300.) "Application of the beneficial parent-child relationship exception consists of a two-prong analysis. [Citation.] The first prong inquires whether there has been regular visitation and contact between the parent and child. [Citation.] The second asks whether there is a sufficiently strong bond between the parent and child that the child would suffer detriment from its termination. [Citation.] [¶]

The first prong is quantitative and relatively straightforward, asking whether visitation occurred regularly and often. [Citation.] [¶]  In contrast, the second prong involves a qualitative, more nuanced analysis, and cannot be assessed by merely looking at whether an event, i.e. visitation, occurred. Rather, the second prong requires a parent to prove that the bond between the parent and child is sufficiently strong that the child would suffer detriment from its termination.  [Citation.]  In applying this exception, the court must take into account numerous variables, including but not limited to (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the '"positive"' or '"negative"' effect of interaction between parent and child, and (4) the child's unique needs." (*In re Grace P.* (2017) 8 Cal.App.5th 605, 612-613.)

"The [parent] has the burden of proving [his or] her relationship with the children would outweigh the well-being they would gain in a permanent home with an adoptive parent. [Citations.]  Evidence of frequent and loving contact is not enough to establish a beneficial parental relationship. [Citations.]  The [parent] also must show [he or] she occupies a parental role in the children's lives."  (*In re Noah G.*, *supra*, 247 Cal.App.4th at p. 1300; see *In re K.P.* (2012) 203 Cal.App.4th 614, 621 ["[n]o matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life'"]; *In re C.F.* (2011) 193 Cal.App.4th 549, 556 ["'[w]here a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent'"]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 577 [severing the

relationship between the parent and the child was not "detrimental to [the child] because the relationship was one of friends, not of parent and child"].) Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)[2]

### 2. *The Juvenile Court's Error Was Harmless*

At the section 366.26 selection and implementation hearing on October 11, 2019, the juvenile court continued the matter to December 6, 2019 and later issued an in-and-out order for Father to be transported to court on that date as well. However, Father was not present on December 6, and nothing in the record suggested he had signed a waiver indicating he did not wish to appear. Because of Father's absence, his counsel objected and requested a continuance. The juvenile court erred in proceeding in Father's absence. (*In re Jesusa V., supra,* 32 Cal.4th at pp. 623-624; *In re M.M., supra,* 236 Cal.App.4th at pp. 962-963.) Although Father's counsel also objected to the termination of Father's parental rights, his counsel did not suggest that Father

---

[2] The California Supreme Court granted review in *In re Caden C.*, S255839, on July 24, 2019, and asked the parties to brief and argue the following issues: "(1) What standard of review governs appellate review of the beneficial parental relationship exception to adoption? (2) Is a showing that a parent has made progress in addressing the issues that led to dependency necessary to meet the beneficial parental relationship exception?"

contended the beneficial parental relationship exception to termination applied, let alone present any evidence or argument on the point.  Assuming the argument was not forfeited by counsel's failure to raise the statutory exception (see *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court," although forfeiture is not "automatic"]; *In re E.A.* (2012) 209 Cal.App.4th 787, 790 ["General objections are insufficient to preserve issues for review. [Citation.]  The objection must state the ground or grounds upon which the objection is based"]), it was not reasonably probable that the juvenile court would have applied the beneficial parental relationship exception had Father been present at the section 366.26 hearing.

Although Father argues that "he had more contact with [Britny] than she was [indicating] to the social worker," the record does not reflect that Father could have added anything to the information already before the juvenile court.  The evidence established that Father did not maintain regular visitation and contact with Cameron.  After the Department reported at the contested six-month review hearing in April 2019 that Father had missed 38 visits with Cameron, the juvenile court concluded "there [was] no likelihood" Father would reunite with Cameron and terminated Father's reunification services.  At that hearing, Father did not argue that he had more contact with Britney than was reflected in the Department's reports.  After the six-month review hearing, Father did not maintain contact with Cameron while he was in North Carolina, and Father missed most of the scheduled visits when Cameron returned to Southern California.  Given Father's lack of regular visitation and contact with

Cameron, it was not reasonably probable that the juvenile court would have determined that Cameron had a beneficial relationship with Father or the court would have selected a permanent plan other than adoption had Father been present at the hearing.  (§ 366.26, subd. (c)(1)(B)(i) [the juvenile court "shall" terminate parental rights unless it finds a compelling reason for determining termination would be detrimental to the child where "[t]he parents have maintained regular visitation and contact with the child and child would benefit from the continuing relationship"]; see *In re Breanna S.* (2017) 8 Cal.App.5th 636, 646-647 [juvenile court's decision may be based on "any or all of the component determinations" of the beneficial parent-child relationship]; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 ["'[s]poradic visitation is insufficient'"].)

Moreover, there was no dispute that Cameron was adoptable and that Britny and Ryan wanted to adopt him. Cameron was thriving with Britny and Ryan, with whom Cameron had lived almost his entire life.  Despite the juvenile court's "heart to heart" talk with Father in September 2018 and the court's October 2018 admonition regarding the limited period available for Father to reunify with Cameron, as well as numerous communications from the Department, Father's compliance with his case plan was "meager."  In fact, despite his admitted substance abuse, Father failed to submit to a single drug test with the Department's approved agency or complete a substance abuse program.  He also failed to complete a 12-step program or enroll in individual counseling.  There was no evidence that Father's relationship with Cameron ""promote[d] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new,

25

adoptive parents.""'" (*In re Marcelo B., supra,* 209 Cal.App.4th at p. 643; accord, *In re Breanna S., supra*, 8 Cal.App.5th at p. 646; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689; see *In re Anthony B.* (2015) 239 Cal.App.4th 389, 396 [beneficial parental relationship exception requires parent to demonstrate "relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption"]; see generally *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373 ["[u]nder [section 366.26] there is no requirement that an absence of benefit from continuing the [parent-child] relationship be proved as an element of termination"].) Under these circumstances, we conclude that it was not reasonably probable the juvenile court would have applied the beneficial parental relationship exception to termination of parental rights had Father been present at the section 366.26 hearing.

Father's reliance on this court's decision in *In re M.M., supra,* 236 Cal.App.4th 955 is misplaced. In *In re M.M.,* an incarcerated mother was involuntarily absent from an adjudication/disposition hearing concerning allegations that she failed to protect her four-year-old son when she took him with her to engage in prostitution and that she failed to make appropriate plans for his care while she was incarcerated. (*Id.* at pp. 958, 962.) The mother disputed the allegations in the petition, telling social workers that she had been interviewing for a job at a strip club and left her son in the car with her boyfriend. (*Id.* at pp. 959-960.) The mother also "insisted" that the police "must have lied" in their report of the incident. (*Id.* at p. 960.)

This court in *In re M.M., supra,* 236 Cal.App.4th 955 concluded that the mother's absence from the hearing was

prejudicial because "nothing suggested the court needed to proceed immediately to adjudicate the petition and craft a disposition order." (*Id.* at p. 962.)  We explained, "[The son] had been placed with his maternal grandmother prior to the scheduled hearing date, so a continuance would not have been destabilizing or otherwise contrary to his interests." (*Ibid.*)  We also emphasized "the vital role that live testimony plays in a court's assessment of credibility and its evaluation of conflicting evidence." (*Id.* at p. 964.)  "Without hearing from [the mother] and assessing her demeanor, the juvenile court rejected her account" of the disputed events on which the court sustained dependency jurisdiction. (*Ibid.*)  "[I]f her oral testimony were believed," this court reasoned, "there is no doubt the result of the challenged proceedings would have been more favorable to her." (*Ibid.*)

Here, in contrast, there was no "conflicting evidence" on a material issue and no need for the juvenile court to make credibility determinations.  Further, unlike the jurisdiction/disposition hearing in *In re M.M.*, the purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children.  (§ 366.26, subd. (b).)  Once the court has decided to end parent-child reunification services, the legislative preference is for adoption.  (§ 366.26, subd. (b)(1); see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and the court then

27

must "concentrate its efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"].)[3]

---

[3] Father argues, had he been at the section 366.26 hearing, "he could have also made the argument, that the trial court's January 2019, order allowing Cameron to be replaced to North Carolina from California violated his fundamental rights." However, Father failed to appeal from the juvenile court's orders of January 25, 2019 and March 4, 2019 granting Cameron's request for an extended visit to North Carolina. (§ 395, subd. (a)(l) ["[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment"].) By waiting to raise this argument on appeal from the order terminating parental rights, Father forfeited the argument. (*In re S.B., supra,* 46 Cal.4th at p. 532 ["'"[a] consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order"'"]; *In re T.G.* (2015) 242 Cal.App.4th 976, 984 ["[g]enerally speaking, 'an unappealed disposition or post disposition order is final and binding and may not be attacked on an appeal from a later appealable order'"]; *In re A.A.* (2012) 203 Cal.App.4th 597, 606 [mother's failure to challenge an earlier ruling by the juvenile court, "despite two opportunities to raise the issue in this court (on appeal from the disposition hearing . . . and by way of writ following the setting of the § 366.26 hearing), forfeited any constitutional challenge"]; *In re A.S.* (2009) 174 Cal.App.4th 1511, 1515, fn. 3 ["[a]n appeal from the most recent order in a dependency case may not challenge prior orders for which the statutory time for filing an appeal has passed"]; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1151 ["an appellate court in a dependency proceeding may not inquire into the merits of a prior final appealable order on an appeal from a later appealable order"].)

28

## DISPOSITION

The juvenile court's December 6, 2019 order is affirmed.


DILLON, J.*


We concur:


PERLUSS, P. J.


FEUER, J.

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.